**Bradley GARRETT, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 01–16–00162–CR**

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued March 30, 2017

Patti Sedita, Sugar Land, TX, for Bradley Garrett.

Kim Ogg, District Attorney–Harris County, Heather A. Hudson, Assistant District Attorney, Harris County, Texas, Houston, TX, for The State of Texas.

Panel consists of Justices Keyes, Bland, and Huddle.

## OPINION

Evelyn V. Keyes, Justice

A jury convicted appellant, Bradley Garrett, of the first-degree felony offense of murder and assessed his punishment at thirty years' confinement.[1] In his sole issue on appeal, appellant contends that the trial court erred by admitting the testimony and report of the DNA analyst in violation of the Confrontation Clause because the analysts who performed the extraction and amplification of the DNA samples did not testify.

We affirm.

## Background

Appellant occasionally worked as an unarmed security guard at the H2O after-hours nightclub in southwest Houston. In the early morning hours of June 22, 2014, the complainant Clark Scott, Maurian Sanders, and Edward Woodrow arrived at the club. All three men had been drinking and smoking PCP, both before they arrived at H2O and outside of the club. The men stayed at the club for about three hours, until around 7:00 a.m., when Sanders decided that he wanted to leave. Outside the club, Scott and Sanders were laughing and making jokes, and Woodrow began recording them with his cell phone directly in front of the door to H2O. Stephen Freeman, an armed security guard at H2O, asked Woodrow to stop recording.

Freeman's disagreement with the men over the recording escalated into a physical fight when appellant intervened to assist Freeman and punched Sanders. During the course of this fight, Freeman passed his gun to appellant. Sanders ran

from the scene and informed security guards, who were directing traffic at a nearby church, of the situation at H2O.

Layla Wuttke, who worked at H2O collecting entrance fees and occasionally bartending, witnessed the altercation and informed the club's manager. When she returned outside, Scott was yelling at Freeman and appellant. Wuttke decided to go home and climbed into her car, which was parked near the front door of H2O. Scott continued yelling, and Freeman and appellant slammed Scott down onto the hood of Wuttke's car before Wuttke could close the car door. With Wuttke watching through the front windshield, appellant held Scott down by the back of his neck, pulled out a gun, and shot Scott in the head. Appellant then turned and started shooting at Woodrow, who was shot four times in both legs as he tried to flee, but survived. At some point, appellant left the scene, possibly through the back exit of H2O. Wuttke got out of the car and hid behind a cement block until the police arrived.

Bill Featherston, one of the security guards working at the nearby church, called 9–1–1 after Sanders ran up to him, and, while he was on the phone, he heard the shooting. Featherston and his supervisor ran to H2O after the shooting ended and found Wuttke, who was uninjured, sitting against a pillar outside the club; Scott, who was "dead for sure," lying on the ground next to Wuttke's car; and Woodrow, who was lying wounded in the parking lot.

Wuttke, Sanders, and Woodrow all viewed a photo-array that included appellant's picture, and all three identified appellant as being involved in the incident. Wuttke positively identified appellant at trial as the shooter, and Woodrow identi-

---

1. *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011).

fied appellant at trial as possessing a gun during the incident.

Sanders and Wuttke testified that appellant had been wearing a baseball cap during the altercation. Houston Police Department Officer M. Condon testified that the crime scene unit recovered a baseball cap from the scene. Bao Tran Nguyen, a forensic analyst with the Houston Forensic Science Center, supervised an analyst in training who swabbed the baseball cap recovered from the scene for later DNA analysis. The analysts swabbed the sweat band, both sides of the bill, and the adjuster of the cap for possible contact DNA evidence. Nguyen then took a cutting from the swab and secured that cutting in a freezer for the DNA technician.

Clay Davis, a forensic DNA analyst with the Houston Forensic Science Center, also testified. He first testified generally concerning the steps of DNA analysis, including extraction of the DNA from the cells of the sample, quantification, amplification, detection, and interpretation. He then testified that the samples in this case underwent those steps. Davis analyzed a portion of the swabs from the baseball cap recovered at the scene. Davis completed a report of his analysis of the swab from the cap compared to appellant's known DNA profile, and the State offered this report into evidence.

Defense counsel objected to Davis's lab report. Counsel first objected because the report referenced appellant's known buccal swab sample, but there had been no testimony to establish chain of custody concerning that sample. Counsel also objected based on hearsay. The State represented that it would call the homicide investigator who had taken the buccal swab from appellant and submitted it to HPD, where it was tagged as evidence. The trial court conditionally admitted the lab report "subject to the testimony of the officer that took the buccal swab." Defense counsel did not object at this point to the lab report or to Davis's testimony on the basis of the Confrontation Clause of the Sixth Amendment.

Davis testified that appellant could not be excluded as a contributor to the major component of the DNA profile recovered from the baseball cap. Davis also testified that the probability that a random individual would be included as a possible contributor to the major component of the DNA profile was 1 in 190 quintillion for Caucasians, 1 in 7.3 quintillion for African-Americans, and 1 in 12 sextillion for southwest Hispanics. Davis stated that, unlike appellant, Scott was excluded as a possible contributor to the major component of the DNA profile found on the baseball cap. The minor component of this DNA profile was "insufficient for comparison."

Before testimony resumed the next morning, defense counsel urged an objection to Davis's testimony and report based on the Confrontation Clause. Specifically, defense counsel stated that she had received the "certificates of analysis" concerning the DNA testing, which indicated that two Houston Forensic Science Center analysts, Kristina Blackmon and Maria Rumble, had performed the DNA extraction and amplification tests on the baseball cap and appellant's buccal swab. Defense counsel argued that whether these tests were properly performed would affect the DNA results and that she had not had an opportunity to cross-examine these analysts, which violated appellant's constitutional confrontation rights.

The State responded that it intended to call both Blackmon and Rumble to testify. The State also suggested that it could recall Davis, who would testify that Blackmon and Rumble were not involved in the analysis of the DNA profiles, but instead they "engage[d] in batch testing so they take samples, several samples on trays and

really take it from one machine to another. It's the machine that does the analysis and develops the data." The trial court deferred ruling on defense counsel's objections because the State had not yet rested its case-in-chief and might call Blackmon and Rumble to testify, which would eliminate any Confrontation Clause issue.

The State recalled Officer Condon, who testified that he had obtained a buccal swab from appellant after he was arrested. After Officer Condon testified again, the trial court addressed defense counsel's confrontation objection and stated, "I'm satisfied that your objection goes to the weight but not the admissibility of the DNA report." The trial court overruled the Confrontation Clause objection. The State rested without calling Blackmon or Rumble.

The jury found appellant guilty of the offense of murder and assessed his punishment at thirty years' confinement. This appeal followed.

### Confrontation Clause

In his sole issue, appellant contends that the trial court erred by admitting the testimony and report of DNA analyst Clay Davis in violation of the Confrontation Clause because, although Davis analyzed and interpreted the DNA results, two other analysts completed the extraction and amplification portions of the DNA testing, but these analysts did not testify at trial.

### A. Governing Law

■ The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[2] U.S. CONST. amend. VI. The United States Supreme Court has applied this rule to out-of-court "testimonial" statements and has held that testimonial statements are inadmissible at trial unless the witness who made the statement (1) takes the stand to be cross-examined or (2) is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004); *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App. 2015). "The prior opportunity to cross-examine in person is both a necessary and a dispositive requirement for the admission of testimonial statements under the Confrontation Clause." *Burch v. State*, 401 S.W.3d 634, 636 (Tex. Crim. App. 2013).

The Supreme Court has not precisely defined what constitutes a "testimonial" statement under *Crawford. See* 541 U.S. at 51–52, 124 S.Ct. at 1364 (describing "[v]arious formulations of this core class of 'testimonial' statements"). However, the Court has included those "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52, 124 S.Ct. at 1364; *Paredes*, 462 S.W.3d at 514; *see also Burch*, 401 S.W.3d at 636 ("While the exact contours of what is testimonial continue to be defined by the courts, such statements are formal and similar to trial testimony.").

■ Although we defer to a trial court's determination of historical facts and credibility, we review a constitutional legal rul-

2. Appellant also argues that the trial court violated his state Confrontation Clause right. *See* TEX. CONST. art. I, § 10. "However, Texas courts decline to apply the state Confrontation Clause guarantee in a broader manner than the federal Confrontation Clause guarantee." *McWilliams v. State*, 367 S.W.3d 817, 820 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

ing, such as whether a statement is testimonial or non-testimonial, de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006); *Hamilton v. State*, 300 S.W.3d 14, 20 (Tex. App.—San Antonio 2009, pet. ref'd) ("We review *de novo* the trial court's ruling admitting evidence over a confrontation objection.").

In the years following *Crawford,* the Supreme Court has addressed the application of the Confrontation Clause to forensic reports in three cases. In the first of these cases, *Melendez–Diaz v. Massachusetts*, a distribution of a controlled substance case, the State offered three notarized "certificates of analysis" which reported the weight of bags of contraband seized by the police and stated that the substance contained within the bags was cocaine. 557 U.S. 305, 308, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314 (2009). The analysts who performed the tests did not testify at trial, and Melendez–Diaz did not have an opportunity to cross-examine the analysts. *Id.* at 309, 129 S.Ct. at 2531. The Supreme Court held that the certificates of analysis were testimonial statements because they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Id.* at 310–11, 129 S.Ct. at 2532 (quoting *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266, 2278, 165 L.Ed.2d 224 (2006)). The Court concluded that the certificates of analysis were made under circumstances that would lead an objective witness reasonably to believe the statements would be available for use at trial and that the analysts completing these certificates were "witnesses." *Id.* at 311, 129 S.Ct. at 2532. Absent a showing that the analysts were unavailable to testify and that Melendez-Diaz had a prior opportunity to cross-examine them, he was entitled to be confronted with the analysts at trial. *Id.*

Two years later, in *Bullcoming v. New Mexico*, the Court addressed whether the introduction of a forensic report through the testimony of an analyst who did not sign the report or observe the particular test that was performed violates the Confrontation Clause. *See* 564 U.S. 647, 652, 131 S.Ct. 2705, 2710, 180 L.Ed.2d 610 (2011). In this DWI case, a forensic analyst tested the blood-alcohol content of Bullcoming's blood sample and certified that this amount was over the legal limit. *Id.* at 653, 131 S.Ct. at 2710. At trial, however, the State did not call the analyst who had performed the test and certified the results because he had recently been placed on unpaid leave. *Id.* at 655, 131 S.Ct. at 2711–12. The State instead offered the testing analyst's report through another analyst, one who was familiar with the laboratory's general procedures but who had neither observed the testing analyst perform the analysis of Bullcoming's blood sample nor reviewed the results of the analysis. *Id.*, 131 S.Ct. at 2712.

The Supreme Court held that this violated the Confrontation Clause. *Id.* at 658, 131 S.Ct. at 2713. The Court held that the testing analyst's report was testimonial and that it could not be admitted into evidence through the "surrogate testimony" of another analyst. *Id.* at 659–61, 131 S.Ct. at 2714–15. The Court also rejected the argument that the testing analyst was a "mere scrivener" of machine-generated data, holding that the testing analyst's certification involved more than just reporting a machine-generated number and that the testing analyst needed to be cross-examined to explore "the particular test and testing process he employed" and to "expose any lapses or lies" on his part. *Id.* at 659–62, 131 S.Ct. at 2714–15.

The Supreme Court most recently addressed whether forensic opinion testimony violated the Confrontation Clause in

*Williams v. Illinois,* a fractured decision in which a majority of the justices agreed that the testimony did not violate the Confrontation Clause, even though they could not agree on a rationale. *See* 567 U.S. 50, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). In that sexual assault case, the Illinois State Police sent vaginal swabs from the complainant's examination to Cellmark, an out-of-state private laboratory, for testing, and Cellmark developed a DNA profile and sent the report back to the police. 132 S.Ct. at 2229. At the time, the defendant was not a suspect for this offense. *Id.* A forensic analyst with the Illinois State Police conducted a computer search to determine whether the Cellmark DNA profile matched any profiles in the state database. *Id.* The search revealed a match to a DNA profile generated from a blood sample of the defendant, who had been arrested on an unrelated charge. *Id.* At trial, the State presented testimony from the forensic scientist who performed a confirmatory test on the complainant's vaginal swabs before they were sent to Cellmark, the analyst who developed the defendant's DNA profile, and the analyst who compared the Cellmark profile to the defendant's profile. *Id.* at 2229–30. The trial court did not admit the Cellmark report into evidence, and no one from Cellmark testified concerning the development of that DNA profile. *Id.* at 2230.

Justice Alito, writing for a plurality of the Court, held that no Confrontation Clause violation occurred because the out-of-court statement by the Cellmark analysts referred to during the testifying analyst's testimony—that the Cellmark DNA profile came from semen found on the complainant's vaginal swabs—was not offered to prove the truth of the matter asserted. *Id.* at 2228. The plurality held, "Out-of-court statements that are related by the [testifying] expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Id.* The plurality also held that the Cellmark report was not testimonial because it was produced before a suspect had been identified, it was not sought "for the purpose of obtaining evidence to be used against [the defendant], who was not even under suspicion at the time," and the Cellmark profile "was not inherently inculpatory." *Id.*

After this series of United States Supreme Court cases, the Texas Court of Criminal Appeals has twice addressed whether a Confrontation Clause violation occurs when the trial court admits forensic reports or opinion testimony. In *Burch v. State,* the defendant was indicted for possession with intent to deliver a controlled substance. *See* 401 S.W.3d at 635. The State offered into evidence a lab report stating the weight of the material analyzed and the finding that the material was cocaine. *Id.* This report was signed by the testing analyst and a reviewing analyst, and at trial, the State called only the reviewing analyst to testify. *Id.* The reviewing analyst agreed that she "basically double-checked everything that was done," but she did not explain what that meant, and there was no indication that she saw or participated in the tests as they were performed. *Id.* at 635–36. The trial court overruled the defendant's Confrontation Clause objection and admitted the lab report and the reviewing analyst's testimony. *Id.* at 636. The Dallas Court of Appeals held that the admission of this evidence violated the Confrontation Clause and reversed the judgment of the trial court. *Id.*

In affirming the opinion of the Dallas Court of Appeals and holding that the trial court violated the Confrontation Clause, the Court of Criminal Appeals held that that case was governed by *Bullcoming. Id.* at 637. The court stated that there was no

indication that the defendant had a pretrial opportunity to cross-examine the analyst who had actually tested the cocaine, and it noted that the record did not indicate whether the reviewing analyst "had personal knowledge that the tests were done correctly or that the tester did not fabricate the results." *Id.* Because the reviewing analyst "could say only that the original analyst wrote a report claiming to have conformed with the required safeguards," cross-examining this witness did not satisfy the defendant's right of confrontation. *Id.* The Court of Criminal Appeals also found it irrelevant that the reviewing analyst had, along with the testing analyst, signed the lab report, stating, "Without having the testimony of the analyst who actually performed the tests, or at least one who observed their execution, the defendant has no way to explore the types of corruption and missteps the Confrontation Clause was designed to protect against." *Id.* at 637–38. The court further stated, "the witness being called needs to have personal knowledge of the facts in issue—the specific tests and their execution." *Id.* at 638.

The Court of Criminal Appeals addressed this issue most recently in 2015 in *Paredes v. State.* In that capital murder case, the police recovered a t-shirt worn by the defendant during the offense and sent the shirt to a private laboratory for DNA testing, which revealed a bloodstain on the shirt that matched the DNA profile of one of the victims. *See* 462 S.W.3d at 512. At trial, the State called the director of the laboratory to testify. *Id.* She testified that DNA testing "is conducted in an assembly-line batch process," with a different analyst conducting each step in the process to generate "raw DNA data." *Id.* Specifically, one analyst applies chemicals to isolate the DNA molecules, another analyst determines the amount of DNA present, a third analyst copies the DNA sequence and loads the data onto the capillary electrophoresis machine which yields a "DNA graph," and then a fourth analyst takes that DNA graph and "uses it to determine whether the DNA profile obtained from the testing matched the DNA profile of a known individual." *Id.*

The director testified that she supervised three analysts who completed the first three steps in this process and that she herself conducted the final step of comparing the DNA profile generated from the bloodstain on the t-shirt to the known DNA profile of the victim. *Id.* The director testified that she "did not physically watch each of the three analysts conduct the DNA testing process," but the lab had protocols in place to identify errors occurring during the process. *Id.* The State did not introduce the raw data that the director relied upon to perform her analysis, and the director testified that "she was not testifying about someone else's opinions because she was responsible for compiling the data generated by the various instruments and reaching the ultimate conclusion." *Id.* at 513.

The Court of Criminal Appeals distinguished the case from both *Bullcoming* and *Burch* because the testifying expert in *Paredes* "was more than a surrogate for a non-testifying analyst's report." *Id.* at 518. In *Paredes*, the director "performed the crucial analysis determining the DNA match and testified to her own conclusions"; she "was not merely a supervisor who 'checked the boxes' on the lab report." *Id.* The court also noted that the lab reports the director relied upon to reach her conclusion were not offered into evidence, so this was "not a case in which the State attempted to bring in a testimonial lab report through a surrogate." *Id.* The *Paredes* court further distinguished that case from prior cases because the director "relied upon raw, computer-generated data in

reaching her conclusion rather than another laboratory analyst's report." *Id.* The court noted that, without the director's independent analysis, the "raw, computer-generated data"—the DNA profiles produced by the capillary electrophoresis instrument—would "stand for nothing on their own." *Id.* at 519. The DNA profiles themselves "are not the functional equivalent of live, in-court testimony because they did not come from a witness capable of being cross-examined. They came from a computer." *Id.* The court thus concluded that no Confrontation Clause violation occurred because the director did not testify regarding a formal report or assertion from a non-testifying analyst. *Id.* "Instead, she used non-testimonial information—computer-generated DNA data—to form an independent, testimonial opinion and appellant was given the opportunity to cross-examine her about her analysis." *Id.*

### B. Preservation of Error

■ On appeal, the State argues that appellant failed to preserve his Confrontation Clause claim for appellate review because he objected to Davis's testimony and lab report based on hearsay and chain of custody grounds, but he did not object based on Confrontation Clause grounds until after Davis had testified.

■ "To preserve error on Confrontation Clause grounds, an objection must be made at trial as soon as the basis for the objection becomes apparent." *Torres v. State*, 424 S.W.3d 245, 256 (Tex. App.— Houston [14th Dist.] 2014, pet. ref'd); *see* TEX. R. APP. P. 33.1(a) (providing that, to preserve error, complaining party must make complaint to trial court by timely request, objection, or motion that states grounds for ruling sought with sufficient specificity to make trial court aware of complaint); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("To avoid for-feiting a complaint on appeal, the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and [he must] do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.' "). Typically, a complaint is timely if it is made " 'as soon as the [objecting party] knows or should know that an error has occurred.' " *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012) (quoting *Hollins v. State*, 805 S.W.2d 475, 476 (Tex. Crim. App. 1991)).

During Davis's testimony, the State offered the lab report that Davis completed. Defense counsel objected on the basis of hearsay and also argued that the State had not established chain of custody because the report referenced appellant's buccal swab, and no witness had testified at that point concerning the taking of appellant's buccal swab. After the State represented that it would call the homicide investigator who obtained the swab, the trial court conditionally admitted the lab report. Defense counsel did not object on Confrontation Clause grounds at this point. Davis then testified concerning his analysis, including his conclusion that appellant could not be excluded as the major contributor to the DNA mixture found on the baseball cap. In his testimony, Davis did not specifically mention the involvement of other analysts in the testing process, and his lab report also did not mention any other analysts.

The next morning, after Davis had testified and before testimony resumed following the evening recess, defense counsel objected to Davis's testimony and report on Confrontation Clause grounds, arguing that she had received the "certificates of analysis," which indicated that two forensic analysts, Blackmon and Rumble, had completed tests relating to appellant's buccal swab and the baseball cap, but that neither

of these witnesses had testified. The record does not reflect when defense counsel received the certificates of analysis and learned that other forensic analysts were involved in the testing.[3] Given that the record is unclear concerning when defense counsel learned that other analysts besides Clay Davis were involved in the DNA testing, thus raising the possibility of a Confrontation Clause violation, we decline to hold that defense counsel's Confrontation Clause objection was untimely and that appellant failed to preserve this claim for appellate review.

We therefore turn to the merits of appellant's Confrontation Clause claim.

## C. Analysis

■ In this case, Davis testified that he analyzed the DNA profile generated from the swab of the baseball cap recovered at the scene of the shooting and the DNA profile generated from appellant's buccal swab. He generally described the steps involved in DNA testing of a sample: extraction, quantification, amplification, detection, and interpretation. Davis testified that the swab of the baseball cap went through all of those steps. Davis's lab report, which was admitted into evidence, stated that appellant could not be excluded as a contributor to the major component of the DNA mixture found on the baseball cap. This report did not indicate that analysts other than Davis were involved in the testing of the baseball cap. Defense counsel offered certificates of analysis by Maria Rumble—who certified that she performed automated DNA amplification and automated DNA capillary electrophoresis on

appellant's known buccal swab—and by Kristina Blackmon—who certified that she performed automated DNA extraction, quantification, amplification, and capillary electrophoresis on the baseball cap and that she performed automated DNA extraction on appellant's known buccal swab—for the trial court to review, but these certificates were not entered into evidence. Neither Blackmon nor Rumble testified at trial, and the trial court did not admit any of the raw DNA data that their analyses generated.

Appellant argues that this case should be governed by *Bullcoming* and *Burch* because Davis, the testifying analyst, did not have personal knowledge that the DNA tests were performed correctly, and he did not testify that other analysts were involved, "much less that he supervised and observed their work." The State argues, instead, that this case should be governed by *Paredes* because Davis's testimony and his report were based on his own analysis of the machine-generated raw DNA data. We agree with the State.

As in *Paredes*, Davis, the testifying analyst, performed the analysis and comparison of appellant's known DNA profile and the DNA profile obtained from the baseball cap, and he testified to his own conclusions at trial. *See* 462 S.W.3d at 518. He was therefore "not merely a supervisor who 'checked the boxes' on the lab report." *See id.* Also as in *Paredes*, any underlying lab reports that Davis relied upon when conducting his analyses were not admitted into evidence. *See id.*; *see also Paredes v. State*, 439 S.W.3d 522, 526 (Tex. App.—

**3.** Bao Tran Nguyen testified directly before Clay Davis. Before Nguyen testified, defense counsel indicated that earlier that day she had received from the prosecutor Nguyen's certificate of analysis concerning the tests that she performed on the baseball cap. The prosecutor stated, "The Defense had not requested certificates of analysis prior to the start of trial, so I got them to her as soon as I could." Neither the prosecutor nor defense counsel stated whether the materials that defense counsel received earlier that day included Rumble's and Blackmon's certificates of analysis.

Houston [14th Dist.] 2014) (noting that State did not introduce into evidence amplified DNA molecules that analysts prepared and inserted into electrophoresis machine or raw data about DNA molecules generated by instrument and provided to testifying director for her analysis), *aff'd*, 462 S.W.3d 510 (Tex. Crim. App. 2015).

In *Paredes*, the testifying analyst "relied upon raw computer-generated data in reaching her conclusion [concerning the comparison of DNA profiles] rather than another laboratory analyst's report." 462 S.W.3d at 518. In distinguishing the forensic testimony in that case from both the lab report stating the weight of cocaine in *Melendez–Diaz* and the lab report stating the blood-alcohol content in *Bullcoming*, the Court of Criminal Appeals noted that raw DNA data generated by the *Paredes* analysts who did not testify was different. *See id.* at 519. In both *Melendez–Diaz* and in *Bullcoming*, "[n]o further analysis was required to render a testimonial statement" that the substance was cocaine or that the blood-alcohol level was over the legal limit. *Id.* With respect to the DNA analysis in *Paredes*, however, "[w]ithout [the testifying analyst's] independent analysis, the DNA profiles—the raw, computer-generated data—that the capillary electrophoresis instrument produced stand for nothing on their own." *Id.* The raw DNA profiles "are not the functional equivalent of live, in-court testimony because they did not come from a witness capable of being cross-examined. They came from a computer." *Id.*; *see also Paredes*, 439 S.W.3d at 527 (holding that raw DNA data generated by non-testifying analysts was not testimonial because (1) raw DNA data was not found in formal report and not admitted into evidence, and (2) raw DNA data was used by testifying analyst to develop her own opinions, and it was testifying analyst's opinions, not raw DNA data, "that asserted facts relevant to [defen-

dant's] prosecution"); *see also Adkins v. State*, 418 S.W.3d 856, 862 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ("[A] forensic report that asserts a fact (e.g., about blood alcohol content or about the contents of a plastic bag) is testimonial.").

The situation in this case is the same as in *Paredes*. The non-testifying analysts, Blackmon and Rumble, performed tests that ultimately generated, via computer, raw DNA profiles. The raw DNA profiles, without further analysis by a forensic analyst, "stand for nothing on their own." *Paredes*, 462 S.W.3d at 519. Davis then used these profiles to develop his opinion that appellant could not be excluded as the major contributor to the DNA mixture found on the baseball cap. It is his opinion, not the raw DNA data, "that asserted facts relevant to appellant's prosecution," and appellant was able to cross-examine Davis regarding his opinion. *See Paredes*, 439 S.W.3d at 527. We therefore agree with the State that because Davis independently analyzed the raw DNA data and offered his own opinion concerning the comparison of the DNA profiles, and he testified and was subject to cross-examination, the admission of his testimony and his lab report, even in the absence of testimony from Blackmon and Rumble, does not violate the Confrontation Clause. *See Paredes*, 462 S.W.3d at 519; *Molina v. State*, 450 S.W.3d 540, 551 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Because [the testifying analyst] independently analyzed the data and offered his own opinions, testified at length and was cross-examined concerning the basis for his opinions, and was not merely relying on the written analysis of others, this case is distinguishable from *Bullcoming* and *Burch* ....").

Appellant argues that *Paredes* is distinguishable because in that case, the testifying analyst testified that, while she ultimately interpreted the DNA data, she

supervised and observed the other analysts complete the earlier steps in the testing process, whereas in this case, Davis led the jury to believe that he completed all of the steps, and he "never testified that any other analysts were involved much less that he supervised and observed their work."

Appellant is correct that Davis did not testify that other analysts, specifically Blackmon and Rumble, were involved in the extraction and amplification processes with these samples. Davis testified generally concerning the steps in the process of DNA analysis:

> The steps for DNA are extraction, which is breaking open the cells, extracting the DNA out. The next step is quantification, which is determining how much DNA you actually extracted out during the first step. And the reason that is important is because the next step, amplification, requires a specific amount of DNA, so I need to know what I'm starting with or how much I actually extracted out. Amplification is copying the DNA. I'm looking at 15 regions of the DNA, and so I'm copying those. The next step is detection, which I'm actually developing a DNA profile. And the last step is interpretation where the actual DNA profiles are interpreted and compared against a known reference if it's available.

The prosecutor later asked Davis, "What was your first step in analyzing [the baseball cap] evidence?" Davis responded, "The item was sent to the screening process, which was actually taking a swab of those areas, and then it moved forward into DNA and it goes through the steps that I previously mentioned, which is extraction, all the way and through interpretation."

Even if Davis's testimony is interpreted as him suggesting that he himself completed every step in the DNA analysis process,

that does not compel the conclusion that appellant recommends that we adopt, namely, that *Paredes* is distinguishable and that the facts of this case are instead more analogous to *Bullcoming*, "where a lab director testified about work done by others." Davis might have testified about extraction and amplification work performed by others, but he also testified about the analysis and interpretation of the DNA profiles generated, the results of which formed evidence linking appellant to the murder scene. Davis himself performed the analysis and interpretation, and he testified and was subject to cross-examination. We agree with the State that *Paredes* is controlling, and *Bullcoming* and *Burch* are distinguishable.

Appellant further argues that, without the testimony of Blackmon, "[t]here is no way to know if some error in her process or procedure would have produced a slightly different result." He points out that Davis testified that the DNA profile obtained from the baseball cap was a mixture of DNA from at least two people, and while appellant could not be excluded as a contributor to the major component of the mixture, there was not enough DNA evidence to build a complete profile of the minor contributor. Appellant suggests that Blackmon "failed to follow protocols or procedures that would have resulted in a full profile on the second part of the mixture." However, even if some error on Blackmon's part led to the inability to develop a DNA profile for the minor contributor to the mixture, that would not affect the finding of DNA consistent with appellant's known DNA profile on the baseball cap.

We hold that the trial court did not err in overruling appellant's Confrontation Clause objection and in admitting Davis's testimony and his lab report.

We overrule appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.