

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-1079-19

**WILBER ULISES MOLINA, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIRST DISTRICT COURT OF APPEALS
### HARRIS COUNTY

**HERVEY, J., delivered the opinion of the unanimous Court.**

## O P I N I O N

This case presents the question of whether the admission of expert testimony about

a DNA-comparison analysis violates the Confrontation Clause when the analysis is based

on computer-generated data from the expert's laboratory and data from another

laboratory. We agree with the court of appeals that it does not, and we will affirm its

judgment.

### FACTS

## a. The Offense

On February 27, 2000, the victim and four of her friends traveled from Port Arthur to Houston to go to the rodeo. They checked into their hotel around 10:00 p.m. and decided to ride around the Richmond/Westheimer area, which the victim described as a "drag" that people would "drive up and down." The group drove around until about 2:30 a.m., at which point they stopped at a 24-hour diner called Mama's Café so some of them could go to the restroom before going back to the hotel. When the victim returned and started to get into her car, a man in a hooded sweatshirt approached her and asked for a cigarette. Before she could respond that she did not smoke, the man told her, "Let me have your car," and she felt something pushing against her side. It was a gun. The man pushed her into the car and across the center console into the passenger seat. After a second man entered the car and sat down in the backseat, the first man drove the car away. While they were driving, the victim was forced into the backseat, and the man in the backseat sexually assaulted her. The victim testified that the two people who kidnapped her met up with two more people, and three of them sexually assaulted her at gun point while she was blindfolded. Eventually they stopped and drove away, leaving her in an empty field. The victim walked to a nearby business and asked someone to call the police. When police arrived, they took her to the hospital where a nurse performed an examination, collected samples, and took the victim's clothes.

The evidence was outsourced to Reliagene for genetic testing, and the DNA profile

it developed was entered into CODIS, but police were not able to identify a suspect until 2017 when Appellant voluntarily gave a cheek swab to the Houston Police Department. Appellant was subsequently indicted for aggravated sexual assault and convicted based on a DNA analyst's testimony that the profile developed from the victim's clothing by Reliagene was probably Appellant's because the chances that a random person other than Appellant was the contributor were in the trillions and quadrillions.

### b. Forensic Evidence

The sexual assault nurse examiner (SANE) collected samples during the examination: a reference blood sample, a pulled head and pulled pubic hair, a loose head hair, vaginal swab(s) and smear(s),[1] right and left-hand fingernail scrapings, two cuttings from an undergarment, a nasal sample, oral swab(s) and smear(s),[2] and two items of "loose evidence collection." When the SANE kit was sent for testing in 2003, the biological section of the Houston Police Department Crime Lab was closed due to quality control issues, so the SANE kit was outsourced to a private-sector laboratory called Reliagene. In processing the evidence, analysts at Reliagene were able to obtain epithelial-cell and sperm-cell fractions from the vaginal swab(s) and two undergarment cuttings. From those, they were able to develop two DNA profiles. The profile developed from the epithelial-cell fraction found on the vaginal swab(s) was consistent with the

---

[1]The report is not clear about how many vaginal and oral swabs and smears were in the SANE kit.

[2]*See supra*, note 1.

victim's known profile, but the other profile was from an unknown donor. A suspect had not yet been identified.

Thirteen years later, Appellant agreed to give a buccal swab for testing. That swab was sent to the Houston Forensic Science Center and processed by Lloyd Halsell, III. Halsell compared the DNA profile he generated from the buccal swab to the DNA profile developed by Reliagene. His analysis showed that the sperm-cell fraction on the vaginal swab(s) was unsuitable for comparison due to insufficient data, but the following information was obtained, which overwhelmingly indicates that the unknown profile developed by the Reliagene analysts was probably Appellant's:

| **Item Tested** | **Results** |
| --- | --- |
| Epithelial-cell fraction from undergarment cutting #1 | The probability that a randomly chosen unrelated individual would be included as a possible contributor to this partial DNA profile is approximately,<br><br>•     1 in 170 trillion for Caucasians,<br>•     1 in 20 quadrillion for African Americans,<br>•     1 in 26 trillion for Hispanics, and<br>•     1 in 1.2 quadrillion for Asians |
| Epithelial-cell fraction from undergarment cutting #2 | The probability that a randomly chosen unrelated individual would be included as a possible contributor to the major component is approximately<br><br>•     1 in 38 quadrillion for Caucasians,<br>•     1 in 3.8 quintillion for African Americans,<br>•     1 in 3.9 quadrillion for Hispanics, and<br>•     1 in 100 quadrillion for Asians |

| Sperm-cell fractions from both undergarment cuttings | The probability that a randomly chosen unrelated individual would be included as a possible contributor to this DNA profile is approximately<br><br>•      1 in 38 quadrillion for Caucasians,<br>•      1 in 3.8 quintillion for African Americans,<br>•      1 in 3.9 quadrillion for Hispanics, and<br>•      1 in 100 quadrillion for Asians |
|---|---|

### c. Trial

The State called Halsell to testify, but the defense objected and argued that Halsell was merely a surrogate for testimonial statements included in the Reliagene report. In response, the trial judge allowed the parties to question Halsell outside the presence of the jury, after which she ruled that Halsell could testify about his own analysis and conclusions. During the evidentiary hearing, Halsell testified that evidence must be processed before a DNA profile can be developed and that processing evidence involves finding areas of interest on the evidence, conducting presumptive tests to find out if genetic material is present, extracting the material, and amplifying the pertinent genetic markers. He also testified that his laboratory uses various controls to ensure the reliability of the data generated in his laboratory. For example, his laboratory uses a reagent blank to ensure that the chemicals used to process the evidence are not tainted with DNA. He said that it also uses a known sample during the amplification step to ensure that the genetic markers were properly amplified. Halsell testified that both techniques were used to verify the data from Reliagene. He also testified that, if there was an error in processing the evidence, he would not expect a useable profile to be developed and that another

person's profile would not be mistakenly generated. Using Reliagene's computer-generated data, Halsell said that he was able to independently verify the profile developed by Reliagene, then compare that profile against the one he developed from Appellant's buccal swab. In ruling that Halsell could testify but that the Reliagene report was inadmissible,[3] the judge considered our decisions in *Burch v. State*, 401 S.W.3d 634 (Tex. Crim. App. 2013) and *Paredes v. State*, 462 S.W.3d 510 (Tex. Crim. App. 2015).

## PROCEDURAL HISTORY

Appellant was indicted for and convicted of aggravated sexual assault. He was sentenced to 55 years' confinement. A split panel of the First District Court of Appeals affirmed his conviction. *Molina v. State*, 587 S.W.3d 100 (Tex. App.—Houston [1st Dist.] 2019). Appellant filed a petition for discretionary review, which we granted, asking whether the court of appeals's opinion conflicts with our decision in *Burch*, 401 S.W.3d at 634.

## CONFRONTATION CLAUSE

The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him. U.S. CONST. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 42 (2004); *Paredes*, 462 S.W.3d at 514. The Confrontation Clause applies to in-court testimony as well as out-of-court testimonial statements. Testimonial statements are those "that were made under circumstances which would lead

---

[3]The report was included in the record for appellate purposes and was not admitted at trial.

an objective witness reasonably to believe that the statement would be available for use at a later trial." This includes some forensic analyses. *Paredes*, 462 S.W.3d at 514 (citing *Crawford*, 541 U.S. at 52).

### a. *Burch*

In *Burch v. State*, 401 S.W.3d at 635, Burch and a companion were arrested by a police officer who saw them in possession of drugs and drug paraphernalia. Burch was indicted for possession of cocaine with intent to deliver. At trial, the State sought to introduce a one-page laboratory report asserting that Burch was in possession of cocaine. The report was signed by the analyst who performed the testing as well as her supervisor. The State called the supervisor to testify but not the analyst who performed the analysis because that analyst no longer worked for the laboratory. The supervisor testified that she "basically double-checked everything that was done," but there was no evidence that she participated in the testing or observed it, and she could not confirm that the non-testifying analyst reached the correct result—that the sample seized from Burch was cocaine. Burch objected on Confrontation Clause grounds. The trial court overruled his objection and admitted the report, the physical evidence, and the supervisor's testimony that the substance was cocaine. We concluded that Burch was entitled to confront the non-testifying analyst because her report contained testimonial statements (that Burch was in possession of cocaine of a particular amount), and the supervisor was only a surrogate witness for the non-testifying analyst.

## b. *Paredes*

In *Paredes*, 462 S.W.3d at 99, this Court revisited the question of how the Confrontation Clause applies to forensic reports. In that case, Paredes and other gang members broke into an apartment to steal money and drugs. During the robbery, two occupants were shot and killed. After Paredes and the other gang members left, Paredes gave another gang member the shirt that he had been wearing, which had blood on it, and asked her to wash it. Instead of washing it, the other gang member notified the police, who seized the shirt. The shirt was subsequently sent to a forensic laboratory called Identigene for DNA testing. Identigene used an assembly-line batch process to "generate [the] raw DNA data." The State called the director of Identigene to testify but not the three analysts who generated the raw DNA data. Paredes objected and argued that he was entitled to confront the three non-testifying analysts and that the director's proposed testimony that the blood on Paredes's shirt likely came from one of the victims would violate the Confrontation Clause because she was only a surrogate for the three non-testifying analysts. The trial court overruled his objection and allowed the director to testify. The computer-generated DNA data was not admitted into evidence. Paredes was subsequently convicted of capital murder.

We held that there was no Confrontation Clause violation, reasoning that the DNA profile developed by the non-testifying analysts was not testimonial because the computer-generated data stood for nothing without further analysis and that the director

was more than just a surrogate because she "performed the crucial analysis determining the DNA match and testified to her own conclusions." We also noted that the reports the director relied on were not offered into evidence and that the same potential human-error problems present in *Burch* were not at play in *Paredes* because the director could verify that her conclusions were properly generated. We further noted that the director also "testified about the safety measures in place at Identigene to detect . . . errors" and that no profile would be generated "if part of the analysis were done improperly . . . ."

## COURT OF APPEALS

### a. The Majority

The court of appeals concluded that Paredes and its decision in *Garrett* controlled. *Garrett v. State*, 518 S.W.3d 546, 547 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). In *Garrett*, the State's DNA expert, who worked at the Houston Forensic Science Center, testified that he compared two DNA profiles generated by other analysts in his laboratory and that the results implicated Garrett. *Id.* The question was whether admission of the testifying expert's testimony violated the Confrontation Clause. *Id.* The court of appeals, relying on *Paredes*, concluded that it did not. It reasoned that the computer-generated data was non-testimonial, and it noted that the computer-generated DNA data was not included in the testifying expert's report and that the underlying reports were not admitted into evidence. *Id.* at 555. Garrett nonetheless argued that the Confrontation Clause was violated because, unlike in *Paredes*, the testifying expert in his case did not supervise the

analysts who generated the DNA data. *Id.* at 555–56. The court of appeals disagreed. *Id.* at 556. It acknowledged the distinction but explained that the difference was irrelevant because, as in *Paredes*, the testifying expert performed the crucial, independent DNA-comparison analysis, and Garrett was able to cross-examine him about the analysis and report. *Id.*

Turning to Appellant's case, the court of appeals recognized that *Paredes* and *Garrett* were distinguishable, but it nonetheless concluded that they controlled. The issue was not where the computer-generated DNA data was developed, it explained, because the data was non-testimonial regardless of where it was generated. The real issue was whether Halsell performed the crucial DNA-comparison analysis, which he did. The court of appeals also noted that, as in *Paredes* and *Garrett*, no reports written by or computer-generated data developed by a non-testifying analyst were admitted into evidence.

The court of appeals was similarly unconvinced by Appellant's argument that Halsell lacked personal knowledge about the quality control protocols at Reliagene. It pointed out that the testifying expert in *Paredes* also did not have personal knowledge about the analysts who developed the computer-generated DNA data even though she supervised them and could testify about the quality control practices of the laboratory in general. The court of appeals found more convincing the director's testimony in *Paredes* that, if there was a technical mistake processing evidence, no DNA profile would have

been generated rather than the wrong one, and it noted that Halsell gave similar testimony. Halsell testified that "he found Reliagene's computer-generated data to be reliable because he was able to generate a DNA profile based on his independent analysis of the data" and that, "[i]f Reliagene had not gathered this data in a scientifically reliable manner," he "would not expect a profile to be generated."

### b. The Dissent

Justice Countiss dissented. According to her, the majority erred in following *Paredes* because, in that case, the director's testimony about the quality control protocols used in her laboratory provided indicia of reliability that the evidence was correctly processed, but Halsell could not provide such testimony. She argued that, unlike in *Paredes*, Halsell did not rely solely on the computer-generated DNA data. Rather, she claimed, "Halsell made clear that his testimony and his own report and conclusions were reliant upon Reliagene's independently created work product . . . ." She also argued that Halsell did not limit himself to testifying about his comparison of the DNA profiles; he also "certified that the analysis performed by an unknown ReliaGene analyst was accurate despite his admitted lack of personal knowledge of ReliaGene's procedures and processes."

### PARTIES'S ARGUMENTS ON DISCRETIONARY REVIEW

The issue here is whether *Burch* or *Paredes* controls. Appellant argues that *Burch* controls because Halsell was only a surrogate witness for testimonial statements in the

Reliagene report, and he asserts that he was unable to "explore the types of corruption and missteps the Confrontation Clause was designed to protect against" because Halsell could not be cross-examined about Reliagene's quality control protocols. *See Burch*, 401 S.W.3d at 637–38. Appellant acknowledges that the Reliagene report was not admitted at trial, but he contends that Halsell "testified directly from the excluded Reliagene report." The State responds that Halsell was not a surrogate because he performed his own independent analysis and that the raw DNA data developed at Reliagene was not testimonial because it "stand[s] for nothing on [its] own." It also asserts that there is no evidence that Halsell testified directly from the Reliagene report, and it points out that Appellant provided no record citations to support his claim.[4]

## ANALYSIS

We agree with the court of appeals's analysis. The Reliagene report is not testimonial. It reflects that presumptive tests were performed on some of the items of evidence, that an epithelial-cell fraction was recovered from the vaginal swab(s), that epithelial-cell and sperm-cell fractions were extracted from the two undergarment cuttings, that quality control protocols had been employed, and it includes data about the partial DNA profile. None of those things are "inherently inculpatory or [were] created for use against [Appellant]." They stand for nothing on their own without additional

---

[4]The State is correct. Appellant included no record citations in his brief. *See* TEX. R. APP. 38.1(I) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

analysis, and even if they had some intrinsic inculpatory value, there was no suspect until years later when Appellant voluntarily provided a buccal swab. *Burch*, 401 S.W.3d at 639 (citing *Williams*, 132 S. Ct. at 2228).

We also conclude that Halsell was not merely a surrogate witness for the non-testifying analysts. The Reliagene report was only a basis for Halsell's independent analysis of the two DNA profiles and his conclusions that the unknown epithelial-cell and the sperm-cell fractions likely came from Appellant. Also, while Appellant claims that Halsell testified directly from the Reliagene report in front of the jury, and thereby put its contents at issue, we have found no such evidence in the record. We also note that the computer-generated DNA data was not included in Halsell's report, and the Reliagene report was not admitted into evidence.

Finally, like the court of appeals, we find Appellant's argument about Halsell's lack of personal knowledge to be unpersuasive. As the court of appeals correctly noted, Halsell gave testimony similar to the director in *Paredes*, and their testimony shows that an important control in the process is that, if there is an error processing evidence, no profile suitable for comparison would be generated, and that in no case would a processing error result in another person's profile being mistakenly generated. As a result, we conclude that Halsell's lack of personal knowledge about the quality control protocols in place at Reliagene does not change the outcome.

Justice Countiss believed that "Halsell did not just rely on raw computer-generated

data from ReliaGene in order to reach his conclusion . . . ." and that Halsell "certified that the analysis performed by an unknown ReliaGene analyst was accurate despite his admitted lack of personal knowledge of ReliaGene's procedures and processes." We disagree. While Halsell said that he relied on the Reliagene report and Reliagene case file, the report included the computer-generated DNA data in written form, and the case file included worksheets and other raw computer data generated by Reliagene to support the DNA profile it developed. Halsell did not rely on an independent analysis by a Reliagene analyst; he "checked their homework." That is, he used the underlying, raw data to determine if he could develop the same profile as the analysts at Reliagene, which he did.[5]

_____

[5]The following exchange took place during the evidentiary hearing,

[STATE:] When you say "process," what's the difference between the processing of a sample and the actual analysis of the sample?

[HALSELL:] So, processing would be the physical looking at the evidence to determine, is there anything to test and then to actually extract the DNA from an item and send it to all the techniques that are necessary to generate that DNA profile. Analysis, in that sense, is to look at the data that is used -- you look at the data that's used to generate that DNA profile and compare it to, one, determine, is it interpretable? Is it something we should do a comparison on? And then if it is, to then look at any known references that we may have and do a comparison with those references.

[STATE:] Now, when you say "data," are you referring to, like, the lab report, or are you referring to computer-generated data?

[HALSELL:] In this instance, I actually looked at printouts of computer-generated data, the original computer-generated data.

The State also asked Halsell what he relied on in forming his opinion and conclusions, and he responded simply, "The computer-generated data." Later, defense counsel asked Halsell whether he compared the known profile from the buccal swab to the "report from Reliagene Technology,"

Also, we do not understand Halsell to have certified that Reliagene followed proper quality control protocols when it processed the evidence. He testified that, based on Reliagene's case file and statements contained therein, Reliagene appeared to use some of the same controls as his laboratory did and that he thought that the data was reliable because he was able to generate the same DNA profile.[6]

The court of appeals was correct that this case is more like *Paredes* than *Burch*.

**CONCLUSION**

Because we agree with the court of appeals that there was no Confrontation Clause violation, we affirm its judgment.

Delivered: October 20, 2021

Publish

---

and Halsell answered that the known profile was "compared to the data that supported [the Reliagene] report."

[6]In response to the prosecutor asking Halsell during the evidentiary hearing whether there was anything about the data itself that "lets you know that there were certain standards or control or other things in place to ensure the data is reliable from a scientific perspective," Halsell said that,

> When I say "review of the data," and truly what I guess I mean is, I reviewed the case file, under the controls, meaning any reagent blanks that are associated with the extractions. So, those are samples that do not contain DNA and are meant to test the reagents to show that they're clean during processing. During one step, a positive control was introduced to show that when you're copying the DNA and making numerous, numerous copies of it, that step was correct. And, so, I also reviewed that to ensure that that worked appropriately, to show that step functioned the way it should have. And, ultimately, all of those have to be acceptable for the data to be acceptable and relied upon.