**Opinion issued August 30, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-16-00826-CR

### NO. 01-16-00827-CR

_____

**DONALD ALVIN OWENS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 15CR0374 & 15CR0375**

## MEMORANDUM OPINION

Appellant Donald Alvin Owens was indicted on two separate counts of aggravated sexual assault of a child. *See* TEX. PENAL CODE § 22.021(a)(1)(B)(iii), (a)(2)(B). The cases were tried together. A jury convicted appellant of both counts,

and the trial court sentenced him to 45 years in prison on each count, to be served consecutively. He brings two issues on appeal. Although he did not raise the issues in the trial court, he argues on appeal that the manner in which the prosecution conducted its direct examination of the complainant violated his rights to confrontation and effective assistance of counsel. Also, despite failing to request a specific unanimity instruction in the jury charge, he argues that the charge erroneously allowed the jury to reach a non-unanimous verdict.

We conclude that appellant waived his constitutional arguments about the complainant's testimony. Further, on the facts of this case, there was no risk of jurors being non-unanimous by rendering their verdict based on different episodes of sexual assault, and thus no egregious harm resulted from the failure to give a specific unanimity instruction. Accordingly, we affirm the judgment of the trial court.

### Background

The complainant, A.M., was born in Wichita, Kansas. Between the ages of three and six, she lived in Texas with her mother and her two brothers. A.M. often played with the children of Robin and Donald Owens at their home, and she sometimes spent the night there. The families were connected because A.M.'s mother dated Robin's brother. A.M. referred to Donald as "Uncle Donny."

A.M. moved back to Kansas when she was six years old. Her father and her grandmother lived in Chanute, approximately 80 miles away from Wichita. Immediately upon A.M.'s return to Kansas, she started spending weekends in Chanute with her father and grandmother.

After a few weeks, A.M. told her grandmother that her "Uncle Donny" had "s-e-x" with her. A.M. also said that he performed oral sex on her. The grandmother called a hotline to report the outcry. She was contacted by Child Protective Services in Kansas, and she was instructed to contact the local police department to start an investigation, which she did.

A social worker conducted a recorded forensic interview of A.M. The report and the recordings were forwarded to the police in La Marque, Texas. Detective S. Samuelson continued the investigation, and he instructed A.M.'s grandmother to take the child to a sexual assault nurse examiner in Chanute.

Appellant Donald Alvin Owens was indicted on two separate counts of aggravated sexual assault of a child under cause numbers 15CR0374 and 15CR0375. The indictment in cause number 15CR0374 alleged that appellant intentionally or knowingly caused his sexual organ to "contact and/or penetrate" the sexual organ of A.M. The indictment in cause number 15CR0375 alleged that appellant intentionally or knowingly caused the sexual organ of A.M. to "contact

3

and/or penetrate" his "mouth and/or tongue." Both indictments alleged that A.M. was younger than six years old at the time of the assaults.

The cases were tried together. Detective Samuelson testified about his investigation, in which he interviewed several of A.M.'s family members. He also interviewed appellant, who "emphatically denied" the allegations. A.M.'s grandmother testified as an outcry witness.

At the time of trial, A.M. was eight years old. The State called her as a witness. Before her direct examination, while the jury was present, the trial court questioned A.M. to establish that she understood the difference between the truth and a lie, and her obligation to be truthful. She then took an oath to tell the truth.

A.M. testified that when she lived in Texas, she would go to "Robin's" house to play with her "step-cousins." She explained that Robin "used to be [her] step-aunt," and "Donny" also lived in the house. A.M. sometimes spent the night at the Owenses' house, and appellant did something that made her uncomfortable. She stated that he did it more than one time, and she was in "the bedroom" when it happened. The prosecutor asked A.M. what happened, and she stated that appellant hurt her "really bad."

Once the State began this line of questioning, A.M. began to respond by shaking her head from side to side or nodding her head up and down, rather than providing verbal responses. To assist A.M. in her testimony, the State provided

4

anatomically correct diagrams of male and female figures. A.M. labeled the vagina as a "potty," and she used the word "wee" to label the penis.

The prosecutor then asked A.M. to describe what happened to her using the terms she had used to label the drawings. A.M. continued to use head gestures to communicate most of her answers. In most instances, the prosecutor followed up to elicit a verbal response, such as by asking, "Can you say, 'yes,' if you're nodding?" or "Is that a 'yes'?" When the prosecutor began to ask A.M. more specific details about the sexual abuse, she gave an inaudible answer. The prosecutor asked A.M. if she would be more comfortable writing her answers, and she indicated that she would. A.M. was then given a notepad and a marker, and she was told she could write her answers to the questions on the pad.

The prosecutor asked A.M. to "write down the part of your body Uncle Donny hurt." A.M. wrote the word "Potty." She was then asked to "write down what Uncle Donny did that hurt your potty?" A.M. wrote the word "sex."

The court instructed A.M. that she could say her answers out loud if she wished, or she could write them on the notepad. Using the notepad, A.M. testified that appellant's "wee" touched her "potty." The prosecutor then asked A.M. to demonstrate what happened, using a box of tissues to represent her "potty" and her hand to represent appellant's "wee." The record reflects that A.M. put her hand inside the tissue box. Using the notepad, A.M. further indicated that white-colored

5

"silk" came out of appellant's "wee" when it touched her "potty." Defense counsel asked to see A.M.'s notes but did not object to the State's questions or A.M.'s responses.

The prosecutor asked A.M. if any other part of appellant's body touched her "potty." She wrote the word "mouth" on a note. As done with the previous note responses, the prosecutor asked a follow-up question to confirm that A.M. had written "mouth." She responded by nodding her head up and down. Defense counsel then objected, stating, "Your Honor, at this point I'm going to object to her nodding. I'd like for her to answer the question." The trial judge instructed A.M. to verbalize her responses. The prosecutor repeated the question, and A.M. again responded by nodding her head up and down. The trial judge asked, "is that a 'yes,'" and A.M. answered "yes" out loud.

Finally, the prosecutor asked A.M. to write down how appellant's mouth touched her "potty." She initially wrote the word "inside." The prosecutor asked A.M. if she had written the word "inside." A.M. said "yes." Defense counsel again objected, arguing that the State was "not allowing the witness to answer the questions," and the prosecutor was "leading and testifying" for A.M. The trial judge told the prosecutor: "I've given you a lot of leeway. But we have kind of – I think she is a smart girl. You can help her get through this." The prosecutor then requested a moment to speak to A.M.

During the bench conference, A.M. added the words "my potty" to her last note. The prosecutor asked A.M. to explain what it meant, and she stated aloud that appellant put his tongue inside her "potty." A.M. further testified that "it felt really uncomfortable" when appellant put his tongue inside her "potty."

Seven of A.M.'s eight notes were admitted into evidence without objection. Defense counsel objected to the final note because A.M. read it aloud. The trial court admitted the note into evidence over counsel's objection.

Defense counsel cross-examined A.M. He asked her about her access to computers, and whether she knew how to find information on the internet. He inquired about whether A.M. knew how to use a DVD player, and whether she watched R-rated movies. He also asked A.M. whether she knew what sex was. She replied "not quite." Counsel then instructed her to use the tissue box to demonstrate "what Uncle Donny did." She complied. He asked her if "it went inside." She responded "yes." Counsel later asked A.M. to read the note on which she had written the word "silk," and he asked if she had ever seen silk before. She responded "no." Counsel asked how she would describe "silk," and A.M. stated that she did not know. Counsel also asked A.M. what a "wee" is, and she responded that it is a "boy's potty."

The State called the sexual assault nurse examiner, J. Wilson, as its final witness. Wilson conducted A.M.'s sexual-assault examination in Kansas. She

testified about her experience as a sexual assault nurse examiner and the procedure for conducting a sexual assault examination. Wilson provided details about the results of A.M.'s physical examination. She also read the following excerpts from her written report, which included her notes of her conversation with A.M.:

> Patient stated, "When I used to go and stay there, Donny would come into my cousin's room and take me to the trailer house and lock the door."
>
> Patient stated he would take my clothes off and he would take off his and would touch my private parts.
>
> . . . .
>
> This nurse stated, "Please tell me more about what happened when he touched your private parts."
>
> Patient stated, "He would lick my private parts with his tongue and touch my private parts with his hand."
>
> . . . .
>
> Patient stated, "One time he put his private part inside my private part and I felt something come out."
>
> . . . .
>
> This nurse asked patient, "Did you feel that more than one time?"
>
> Patient stated, "No. Just once."
>
> This nurse asked patient, "Did Donny wake you up more than one time?"
>
> Patient stated, "Yes. Like, a whole bunch. He would get me in the night about every time when I would stay the night with them, but I haven't stayed with my cousins for a long time. They live in Texas."

According to the written report, A.M. also told Wilson that appellant made her touch his penis, and he made her perform oral sex on him.

The trial court provided the jury separate instructions on each cause number, and the jury found appellant guilty of two counts of aggravated sexual assault of a child. He appeals.

**Analysis**

**I.      Method of direct examination of complainant**

In his first issue, appellant argues that because A.M. responded to questions at trial with head movements, and she wrote some of her answers on a notepad, he was deprived of his constitutional rights to confrontation and effective representation of counsel.

To preserve an error based on the Confrontation Clause, an objection must be made in the trial court as soon as the basis for the objection becomes apparent. *E.g.*, *Garrett v. State*, 518 S.W.3d 546, 553 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). The objection must be sufficiently specific to make the trial judge aware of the basis of the complaint. *See* TEX. R. APP. P. 33.1(a)(1); *see also Pena v. State*, 285 S.W.3d 459, 463–64 (Tex. Crim. App. 2009). If the objecting party fails to clearly convey his complaint in a manner that would afford the trial court an opportunity to correct the error, he forfeits the complaint on appeal. *Pena*, 285 S.W.3d at 464; *Garrett*, 518 S.W.3d at 553.

Appellant contends that he twice objected "that the prosecutor was not allowing the child to be speak and testifying for her." The record reflects that defense counsel did object to A.M. "nodding" in response to a question on direct, and he requested that she "answer the question." The trial court instructed A.M. to respond out loud, and she did. The objection came after A.M. had already responded, without objection, to other questions using head gestures. Appellant's second objection was based on a complaint that the State was "not allowing the witness to answer the questions," and defense counsel asserted that the prosecutor was "leading and testifying" for A.M.

These objections identified the leading nature of the State's questions, but they made no express suggestion that appellant's constitutional rights were being compromised. The objections were not sufficiently specific to alert the trial court to the complaint raised on appeal, in which appellant contends that the State's method of direct examination violated his confrontation rights or his right to have effective representation of counsel. *See Pena*, 285 S.W.3d at 464 (holding that a defendant is "obligated to put the trial judge on notice of the specific legal theory" that forms the basis for his objection, or he later forfeits the complaint on appeal). Appellant makes no argument that he is entitled to raise these issues for the first time on appeal despite his failure to properly preserve them at trial.

Accordingly, we conclude that appellant has waived these issues on appeal. *See Gallo v. State*, 239 S.W.3d 757, 768 (Tex. Crim. App. 2007) (holding that appellant waived issue for review by failing to adequately brief why his unpreserved complaint should be considered for the first time on appeal).

## II.     Jury charge

In his second issue, appellant argues that the trial court erred by failing to properly instruct the jury that it was required to reach a unanimous verdict as to one specific incident of aggravated sexual assault for each case. He contends that the State presented evidence of multiple sexual acts.

"Texas law requires that a jury reach a unanimous verdict about the specific felony that the defendant committed." *Cosio v. State*, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011); *see also Gomez v. State*, 498 S.W.3d 691, 695 (Tex. App.—Houston [1st Dist.] 2016, no pet.). To be unanimous in its verdict, the jury must agree upon a single, distinct incident that would constitute commission of the alleged offense. *Cosio*, 353 S.W.3d at 771.

As it pertains to appellant's complaint in these cases, non-unanimity may occur when the State charges a defendant with one offense and presents evidence that he committed the charged offense on multiple but separate occasions. *Id.* at 772. To ensure unanimity, the charge must instruct the jury that its verdict must be unanimous as to a single offense. *Id.* A defendant may choose to require the State

to elect a specific criminal act that it relies upon for conviction. *See id.* at 774. This choice is strategic and it may be waived or forfeited. *Id.* at 775. However, even when the State is not required to elect, the trial judge bears the ultimate responsibility to ensure unanimity through the instructions in the jury charge. *Id.* at 776.

We use a two-step process to analyze an allegation of charge error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). First, we decide whether an error exists. *Id.* If we determine that an error exists, we analyze the error for harm. *Id.* When, as in these cases, appellant failed make a timely and specific trial objection to an alleged unanimity error in the charge, we review under the egregious harm standard set forth in *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). *See Cosio*, 353 S.W.3d at 776.

To constitute egregious harm, a charge error must have affected "the very basis of the case," "deprive[d] the accused of a valuable right," or "vitally affect[ed] his defensive theory." *Gomez*, 498 S.W.3d at 696 (quoting *Almanza*, 686 S.W.2d at 172). To determine whether appellant suffered egregious harm, we evaluate the error in the light of the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as

a whole. *Cosio*, 353 S.W.3d at 777. The analysis is done on a case-by-case basis. *Id.*

In cause number 15CR0374, the State alleged one count of aggravated sexual assault of a child that occurred on or about December 22, 2014. The charge instructed the jury:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 22nd day of December, A.D. 2014, in Galveston County, Texas, the Defendant DONALD ALVIN OWENS, did then and there, intentionally or knowingly *cause the contact and/or penetration of the sexual organ of [A.M.]*, a child who was then and there younger than 6 years of age, *by the defendant's sexual organ* then you will find the Defendant guilty as charged in the indictment.

(Emphasis supplied.)

In cause number 15CR0375, the State alleged one count of aggravated sexual assault of a child that occurred on or about December 22, 2014. The charge instructed the jury:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 22nd day of December, A.D. 2014, in Galveston County, Texas, the Defendant DONALD ALVIN OWENS, did then and there, intentionally or knowingly *cause the sexual organ of [A.M.]*, a child who was then and there younger than 6 years of age, *to contact and/or penetrate the mouth and/or tongue of the Defendant*, then you will find the Defendant guilty as charged in the indictment.

(Emphasis supplied.)

Both charges instructed the jury that any testimony related to extraneous offenses was to only be considered in determining appellant's intent, appellant's or

A.M.'s state of mind, or any previous relationship between appellant and A.M. in connection with the offense. Each charge also included a general unanimity instruction.

Appellant contends that the State presented evidence of acts of sexual abuse that occurred "at multiple locations on multiple occasions." Accordingly, because each charge did not instruct the jury that it needed to unanimously base its verdict on a single offense among those presented, he argues that both charges were erroneous. When evidence of multiple different instances of conduct constituting the same offense is presented, neither an extraneous-act instruction nor a general unanimity instruction is sufficient to ensure a unanimous verdict on a single incident. *See Gomez*, 498 S.W.3d at 697.

The instructions for each cause number alleged aggravated sexual assault of a child in a different manner. Cause number 15CR0374 alleged that Owens caused his "sexual organ" to "contact and/or penetrat[e]" A.M.'s sexual organ. Cause number 15CR0375 alleged that Owens performed oral sex on A.M.

### a. Cause number 15CR0374

The record demonstrates that the State presented evidence that appellant vaginally penetrated A.M. with his penis on only one occasion. A.M. testified that appellant's "wee" touched her "potty." The State asked her to demonstrate, using her hand and a tissue box, how his "wee" touched her "potty." The record reflects

that her demonstration indicated that his "wee" went inside of her "potty." She further testified that something "white" and "silky" came out of his "wee." A.M. did not say that this happened on more than one occasion. Wilson read a portion of her written report in which she had noted that A.M. said that "one time," appellant "put his private part inside [her] private part." The State did not present any other evidence suggesting that appellant penetrated A.M.'s vagina with his penis, or that he otherwise caused his penis to come into contact with her vagina on any other occasion. Because the State presented evidence of only one instance of the act alleged in the court's charge for cause number 15CR0374, a specific unanimity instruction was not required. The trial court therefore did not err by failing to charge the jury further on unanimity in that case.

### b. Cause number 15CR0375

After A.M. demonstrated that appellant had penetrated her vagina with his penis, the State asked her if any other part of his body touched her "potty." Through oral testimony and written responses on notes, A.M. testified that appellant put his tongue inside of her vagina. She did not testify that this act happened more than once.

Wilson's testimony revealed that A.M. told her that the abuse happened when she used to stay at her cousin's house. Her report described various sexual conduct, and it established that A.M. told her that appellant had sexually abused

15

her more than once. Wilson read a portion of her report that indicated that A.M. told her that appellant performed oral sex on her more than once: "Patient stated, 'He would lick my private parts with his tongue and touch my private parts with his hand.'" However, Wilson did not testify about additional details of any one incident, such as an approximate date, specific conduct on a particular date, or other circumstances which would differentiate multiple instances. The report also was devoid of any such information.

The evidence presented did not describe multiple particular instances of the alleged aggravated sexual assault, nor did it describe one, distinct detailed incident. Rather, both A.M.'s testimony and Wilson's recitation of her written report described a particular manner in which appellant sexually assaulted her by performing oral sex on her. The evidence indicated that the act occurred numerous times. Accordingly, all of the incidents of oral sex were presented with equal specificity, and none of those incidents were distinguished in any manner from one another.

We conclude that, to the extent a non-unanimous verdict was a theoretical possibility due to the evidence that appellant performed oral sex on A.M. on multiple but separate occasions, there was no egregious harm to him on the specific facts of this case. There was no danger that some jurors would find that appellant performed oral sex on A.M. on or about the date alleged in the charge,

16

while others would have found that he committed that same offense on some other, unspecified date. A.M. articulated one type of sexual act committed by appellant. The evidence did not distinguish between any particular oral sex incidents. A.M. either was credible in giving this consolidated account or she was not. *See Owings v. State*, 541 S.W.3d 144, 150 (Tex. Crim. App. 2017); *see also Dixon v. State*, 201 S.W.3d 731, 735 (Tex. Crim. App. 2006). Further, to the extent Wilson's report indicated that the act happened on more than one occasion, the report did not provide any additional detail beyond A.M.'s own testimony at trial.

We overrule appellant's second issue.

## Conclusion

We affirm the judgments of the trial court.

Michael Massengale
Justice

Panel consists of Justices Massengale, Brown, and Caughey.

Do not publish. TEX. R. APP. P. 47.2(b).