**Opinion issued August 29, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00317-CR

————————————

## WILBER ULISES MOLINA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1433542**

---

## DISSENTING OPINION

A jury found appellant, Wilber Ulises Molina, guilty of the felony offense of

aggravated sexual assault[1] and assessed his punishment at confinement for fifty-five

years. In his first and second issues, appellant contends that the evidence is legally

---

[1]  *See* TEX. PENAL CODE ANN. § 22.021.

insufficient to support the appellant's conviction and the trial court erred in admitting certain testimony in violation of his constitutional right to confrontation.[2]

At trial, over appellant's objection, the trial court allowed a deoxyribonucleic acid ("DNA") analyst to testify based on DNA testing performed by others at an independent, out-of-state laboratory with which the analyst had no affiliation. In doing so, the trial court erroneously allowed DNA evidence to be admitted through a surrogate witness in violation of appellant's constitutional right to confrontation. The erroneously admitted DNA evidence was the only evidence admitted into the record linking appellant to the aggravated sexual assault of the complainant. Accordingly, I would hold that the evidence is legally insufficient to support appellant's conviction. Because the majority opinion holds that the trial court did not err in admitting the testimony of the DNA analyst in violation of the appellant's right to confrontation and that there is legally sufficient evidence to support appellant's conviction, I respectfully dissent.

### Background

In 2003, the complainant was abducted by four men and sexually assaulted by at least three men at gunpoint. During those assaults, the complainant was

---

[2] *See* U.S. CONST. AMEND. VI; TEX. CONST. art. 1, §10. In his third issue, appellant contends that the trial court erred in overruling his objection to certain portions of the state's closing argument. Due to my disposition of appellant's first and second issues, it is not necessary to address his third issue. *See* TEX. R. CIV. P. 47.1.

blindfolded and, therefore, unable to identify the men who abducted, sexually assaulted, and then abandoned her in a soccer field late at night. There were no other witnesses to the sexual assaults. As part of the law enforcement officers' investigation, a vaginal swab was taken from the complainant along with two "cuttings" from her underwear, believed to contain semen from some or all of her assaulters. This evidence was sent to ReliaGene Technologies, Inc. ("ReliaGene"), an independent laboratory outside of New Orleans, for processing of DNA evidence and a report.

Before trial, appellant moved to exclude the DNA evidence processed by ReliaGene, including a "Forensic Test Results" report from ReliaGene as well as any testimony by Lloyd Halsell III, a DNA analyst who did not perform the DNA testing for ReliaGene. Appellant asserted that use of the report and other evidence concerning the DNA testing performed by ReliaGene would violate his Sixth Amendment right to confrontation. The trial court held an evidentiary hearing on appellant's motion.

At the hearing, Halsell, an operations coordinator for the Houston Forensic Science Center ("HFSC"), who is trained in DNA analysis, testified that in 2003, when the complainant was sexually assaulted, the former Houston Police Department Crime Lab ("HPD Crime Lab") was not processing DNA evidence due to quality-assurance issues. Thus, the DNA evidence collected after the

3

complainant's 2003 sexual assaults was outsourced for processing to ReliaGene. After processing the kit, ReliaGene issued a "Forensic Test Results" report that it sent back to the former HPD Crime Lab.

Halsell further testified that, in 2017, HFSC received a DNA sample, also called "a reference," for appellant that it processed "in-house to generate a DNA profile" for appellant that could be compared to "the work that was done by Relia[G]ene." Notably, neither Halsell nor anyone else at HFSC tested the DNA evidence collected in 2003 following the aggravated sexual assault of the complainant. Instead, Halsell relied on unknown analysts at ReliaGene in ultimately concluding that appellant's 2017 DNA sample or "reference" matched the DNA evidence processed independently by ReliaGene in 2003. Halsell also explained that the "Forensic Test Results" report contained the "same data" as Halsell's own 2017 laboratory report, which states at the top: "previous analysis, Relia[G]ene Technology Laboratory." And although Halsell stated that he believed that his report was "independent from" the Relia[G]ene report, he specifically noted that his report was "based on the data that was used to generate" the ReliaGene "Forensic Test Results" report.

Regarding ReliaGene's procedures and protocols, Halsell testified that he "was not involved with the . . . physical processing of the [DNA] evidence" sent to ReliaGene in this case, he "never worked for Relia[G]ene," and he was "never a part

4

of the [DNA] testing of th[e] materials" at ReliaGene or otherwise. He further testified that his laboratory report was based on the data, DNA profile, and "Forensic Test Results" report generated independently by ReliaGene, although he had no knowledge of ReliaGene's standards and protocols, or how ReliaGene's DNA testing was actually performed, and he did not supervise anyone at ReliaGene who performed the DNA testing related to the complainant's 2003 aggravated sexual assault. Yet, when asked whether he could tell the trial court how ReliaGene's data was generated, Halsell responded:

> [W]ell, as I said, my review would have been a review of their case file. So, their extraction paperwork, their amplification paperwork, all of their controls, I was able to say that the data they obtained was reliable and sufficient that we can rely on it and use that data.

At the conclusion of the evidentiary hearing, the trial court excluded ReliaGene's "Forensic Test Results" report but it allowed Halsell to testify about *all* of the DNA evidence, including data and analysis from the excluded ReliaGene "Forensic Test Results" report. No witness from ReliaGene testified as to the DNA testing it performed in this case.

At trial, no witness from ReliaGene testified as to the processing or testing of the DNA evidence in this case. Instead, the State, through Halsell's testimony, introduced evidence about ReliaGene's DNA processing and testing about which Halsell previously admitted that he had no personal knowledge. For example,

Halsell testified regarding ReliaGene's process for testing the DNA evidence in this case as follows:

> So, the process there is they would—I don't know exactly how they were instructed, in terms of what items to look at. But they would have examined those items to then go through that process of what I was talking about to initially screen it and then go through those extractions and all of those steps to generate a DNA profile.

Halsell also testified that ReliaGene "worked the cases" that it received due to the issues with the former HPD Crime Lab "together" and "in batches." The HFSC would then "review[] the data off of the CDs" it received from ReliaGene. In other words, ReliaGene would have sent HFSC a "batch" of different DNA profiles from multiple different people related to different cases. And in regard to the DNA evidence in the instant case, when Halsell testified about the "chain of custody," he noted that the actual DNA evidence collected from the complainant would have been sent back to the former HPD Crime Lab from ReliaGene in a box that had two different cases with two different numbers. And when asked about the "sticky" note on the box that referenced other case numbers, Halsell responded that he did not "know what that note is referring to, whether it's referring to the evidence, [or] whether it's referring to reports. I have no knowledge of that note and really have not seen that before [that day at trial]."

Halsell further testified that despite "whatever happened with [the ReliaGene] lab in New Orleans in 2004," such as 'whether there was an error or not an error,

6

there was a DNA profile that was generated." However, he did not know "exactly how [ReliaGene DNA analysts] were instructed, in terms of what to look at," and he had "no personal knowledge . . . of th[e] process that was done" at ReliaGene. And Halsell confirmed that he had never worked at ReliaGene, he did not supervise anyone there, he did not see "any of the machines" there or "know [ReliaGene's] protocols and the[] steps that" were taken with respect to the processing and testing of the DNA evidence in the instant case.

Notably, despite Halsell's unfamiliarity with ReliaGene, its processes, procedures, protocols, personnel and chain-of-custody precautions, he based his report and testimony linking appellant to the 2003 aggravated sexual assault of the complainant on "the data that was generated by [ReliaGene's] laboratory," along with ReliaGene's "case file and all of their worksheets" and "computer data." Halsell confirmed that, assuming there was sufficient DNA evidence remaining after ReliaGene's testing, he could have re-tested the evidence himself—the screening, extraction and analysis—but he did not do so. Instead, he testified that based on the underwear "cuttings" that were independently processed by ReliaGene, "Wilber Molina was not excluded as a possible contributor to the DNA" found on the garmet. He further concluded that, from "the profile that [ReliaGene created and Halsell] observed on the evidence, that if [he] were to look randomly at the

population . . . [he] would expect that [he] would have to look at 3.9 quadrillion profiles to see that [same DNA] profile again."

**Confrontation Clause**

In his first issue, appellant argues that the trial court erred in admitting the testimony of Halsell based on DNA testing performed by others at an independent out-of-state laboratory with which Halsell had no affiliation because, by doing so, the trial court violated his right to confrontation. *See* U.S. CONST. Amend. VI; TEX. CONST. art. 1, § 10.

We review a trial court's decision to admit evidence for an abuse of discretion. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted).

A criminal defendant in the State of Texas has the right to be confronted with the witnesses against him. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."); TEX. CONST. art I, § 10 ("In all criminal prosecutions the

8

accused shall be . . . . confronted by the witnesses against him[.]"). The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *see also Crawford v. Washington*, 541 U.S. 36, 42 (2004); *Coy v. Iowa*, 487 U.S. 1012, 1016 (1988) (Confrontation Clause "guarantees [a] defendant a face-to-face meeting with witnesses appearing before the trier of fact"). And it bars admission of the testimonial statements of a witness who does not appear at trial unless the witness is unavailable to testify and the defendant has had a prior opportunity for cross-examination. *See Davis v. Washington*, 547 U.S. 813, 821 (2006) (citing *Crawford*, 541 U.S. at 53–54, (2004)). Whether a statement is testimonial or nontestimonial is a question of law that we review de novo. *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

The United States Supreme Court has declined to provide a "comprehensive definition" of the term "testimonial." *Crawford*, 541 U.S. at 68. However, in *Crawford*, the landmark confrontation clause case, it explained that the confrontation clause applied "at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* The Court further defined a core class of testimonial statements to include: (1) ex parte in-court testimony, (2) affidavits, (3) depositions, (4) confessions, (5) custodial

examinations, and (6) statements made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51–52.

Subsequent cases from the United States Supreme Court have continued to explore what types of statements are considered "testimonial" in nature. In *Melendez-Diaz v. Massachusetts*, the Supreme Court made clear that *Crawford's* rule reaches forensic evidence, which is not "uniquely immune from the risk of manipulation." 557 U.S. 305, 318 (2009). There, the Court held that admitting certain notarized "certificates of analysis" showing the result of forensic testing and stating that the substances seized from the criminal defendant contained cocaine, without requiring any testimony from the analysts who performed the testing, violated the defendant's right to confrontation. *See id.* at 309–311. As the Court explained, "certificates of analysis" had a clear evidentiary purpose, were made under circumstances which would lead an objective witness reasonably to believe that the "certificates of analysis" would be available for use at a later trial, and, thus, they "f[ell] within the Clause's 'core class of testimonial statements.'" *Id.* at 310–311 (quoting *Crawford*, 541 U.S. at 51–52). Further, the Court rejected the argument that the Confrontation Clause should not apply to bar the admission of the "certificates of analysis" because the "statements" in the certificates resulted from "neutral scientific testing," making them presumptively reliable. *Id.* at 318.

10

According to the Court, the Confrontation Clause requires reliability to be assessed in a "particular manner," namely, through "testing in the crucible of cross-examination." *Id*. at 317 (quoting *Crawford*, 541 U.S. at 61).

Then, in *Bullcoming v. New Mexico*, the Supreme Court held that a forensic laboratory report was also testimonial and that the testimony explaining the report from a witness who did not personally perform the forensic testing detailed in the report violated the criminal defendant's right to confrontation. 564 U.S. 647, 652 (2011). In that case, the state, at trial, introduced the results of the criminal defendant's blood alcohol testing through an analyst who was familiar with the testing laboratory's procedures, but who had not participated in and had not observed the forensic testing of the defendant's blood sample. *Id*. at 651. On appeal, the question presented to the Court was "whether the Confrontation Clause permitt[ed] the [state] to introduce a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." *Id*. at 652. Significantly, the Court determined that the State's resort to the use of a "surrogate" witness, in place of the analyst who created the forensic laboratory report, did not satisfy the Confrontation Clause. *Id.* And, the criminal defendant had a "right . . . to be confronted with the analyst who [completed the testing], unless that analyst [was] unavailable at trial,

11

and the [defendant] had an opportunity, pretrial, to cross-examine that particular scientist." *Id.*

Most recently, in *Williams v. Illinois*, the Supreme Court issued a plurality opinion, regarding certain testimony concerning DNA evidence in circumstances similar to the ones present in this case. *See* 567 U.S. 50, 55–141 (2012). At the very least, the Court's struggle to resolve the same issue we face in this case confirms the seriousness of the matters at stake.

In *Williams*, the complainant "was abducted while she was walking home from work." *Id.* at 59. The perpetrator then sexually assaulted her, robbed her, and left her "in[] the street." *Id.* At the hospital, doctors "took a blood sample and vaginal swabs." *Id.* In linking the criminal defendant to the sexual assault of the complainant, the State relied on a "DNA profile produced by an outside laboratory." *Id.* at 56. Specifically, the State called a witness to testify about the DNA generated by another laboratory at which the witness did not work or ever "set foot" inside. *Id.* at 56, 60–62; *see also id.* at 125 (Kagan, J., dissenting). The witness also revealed that she did not conduct or observe any of the forensic testing that created the DNA profile, which she then "matched" to the criminal defendant. *Id.* at 62.

Significantly, four of the Justices dissented in *Williams*, concluding that the testimony at issue constituted "surrogate testimony" like the testimony of the witness who did not actually perform the forensic testing in *Bullcoming*, and should have

12

been excluded for a violation of the criminal defendant's right to confrontation. *See id.* at 118–141 (Kagan, J., dissenting). Writing for the dissent, Justice Kagan explained the dangers of allowing evidence of a forensic laboratory report to come in through a "surrogate witness" because the witness "could not convey what [the actual analyst who completed the testing of the DNA evidence] knew or observed about the events . . . , i.e., the particular test and testing process he employed," "[n]or could such surrogate testimony expose any lapses or lies" on the forensic testing analyst's part. *Id.* at 124 (Kagan, J., dissenting) (first and second alterations in original) (emphasis omitted). "Like the lawyers in *Melendez-Diaz* and *Bullcoming*, Williams's attorney could not ask questions about that analyst's proficiency, the care he took in performing his work, and his veracity." *Id.* at 123 (Kagan, J., dissenting) (internal quotations omitted). Importantly, "[h]e could not probe whether the analyst had tested the wrong vial, inverted the labels on the samples, committed some more technical error, or simply made up the results." *Id.* at 125 (Kagan, J., dissenting). The dissenting Justices noted that "[a]t least the surrogate witness in *Bullcoming* worked at the relevant laboratory and was familiar with its procedures," which was not true for the surrogate witness in *Williams*. *Id.* (Kagan, J., dissenting).

Significantly, the dissent reiterated, as the Supreme Court had emphasized in *Melendez-Diaz*, that "in response to claims of the *über alles* reliability of scientific evidence: [i]t is not up to [the court] to decide, *ex ante*, what evidence is trustworthy

13

and what is not" because "the Confrontation Clause prescribes its own 'procedure for determining the reliability of testimony in criminal trials,'" namely, "cross-examination." *Id.* at 138 (quoting *Crawford*, 541 U.S. at 67). Dispensing with cross-examination "because testimony is obviously reliable is akin to dispensing with jury trial because a [criminal] defendant is obviously guilty." *Id.* (quoting *Crawford*, 541 U.S. at 67). This should not be a stance supported by the Court.

The United States Supreme Court is not the only court to address a criminal defendant's right to confrontation in circumstances similar to the instant case. Most notably, in *Burch v. State,* the Texas Court of Criminal Appeals, relying on the Supreme Court's analysis in *Bullcoming*, disapproved of the admission of a laboratory report without the criminal defendant being able to cross-examine the analyst who tested a substance contained in a ziplock bag found on the defendant. 401 S.W. 3d 634, 640 (Tex. Crim. App. App. 2013). Instead, the State offered as its witness an analyst who did not do any "testing," but simply "review[ed]" the work done. *Id.* at 635–36. On appeal, the Dallas Court of Appeals held that the trial court erred in admitting the laboratory report and the "reviewer" analyst's testimony that the substance found on the criminal defendant was cocaine. *Id.* And the Texas Court of Criminal Appeals agreed, noting that although "the testifying witness[, the reviewing analyst,] was a supervisor who 'reviewed' the original process, [the Court

14

could not] say, on th[e] record, that [the witness] had personal knowledge that the tests were done correctly or that the tester did not fabricate the results." *Id.* at 637. Accordingly, it was error to admit the laboratory report, which contained testimonial statements, and the reviewing analyst's testimony about the results of testing that she did not complete and who could not verify the authenticity of the statements. *Id.* Stated differently, the Court held that the admission of the laboratory report and the reviewing analyst's testimony violated the criminal defendant's right to confrontation. *Id.* at 637–38 ("Without having the testimony of the analyst who actually performed the tests, or at least one who observed their execution, the defendant has no way to explore the types of corruption and missteps the Confrontation Clause was designed to protect against."). As the Court explained, the "State cannot sidestep the Sixth Amendment" by creative wordsmithing. *Id.* at 639.

In an about-face two years later, the Court in *Paredes v. State*, when faced with the same Confrontation Clause dilemma as in *Burch*, determined that the criminal defendant's right to confrontation was not violated. *See* 462 S.W. 3d 510, 519 (Tex. Crim. App. 2015). Inexplicably, the Court distinguished *Paredes* from *Burch*, on the basis that the State, in *Burch*, "called the testing analyst's supervisor who signed the lab report but had not performed or observed any testing." *Id.* at 518. In other words, the laboratory reports admitted into evidence in *Burch*

15

contained testimonial statements that were admitted "through the expert testimony of a [surrogate witness] who did not make th[e] statements and could not verify the authenticity of th[e] statements." *Id.* In contrast, according to the Court, in *Paredes*, the testifying witness was a supervisor in the laboratory where the forensic testing took place, she "performed the crucial analysis determining the DNA match," she "testified to her own conclusions," she "testified about the safety measures in place" at the lab to detect errors and the laboratory reports she relied on to reach her conclusions "were not offered into evidence." *Id.* at 512, 518. Further, because the witness relied on "non-testimonial information—computer-generated DNA data—to form [her] independent, testimonial opinion and [the defendant] was given the opportunity to cross-examine her about her analysis," the Court held that the testifying witness in *Paredes* was "more than a surrogate for a non-testifying analyst's report." *Id.* at 518–19.

Here, the majority opinion errs in relying on *Paredes* and in extending its holding to apply to the facts of this case. In *Paredes*, the Court could not have reached its conclusion but for the other factors weighing in favor of the testifying witness's reliability. As the Court clearly explained, "more importantly, [the witness] testified about the safety measures in place at [the laboratory] to detect . . . errors and stated that, if part of the analysis were done improperly, the

laboratory procedure would not generate an incorrect DNA profile."[3]  *Id.*  In other words, the testifying witness in *Paredes* had a distinct level of first-hand knowledge due to working in the same laboratory as the other analysts who participated in generating the inculpatory DNA profile.  And she was testifying as "*more than* a surrogate" because she actually performed "the crucial analysis" and merely relied on another analyst's "computer-generated data in reaching her conclusion rather than another analyst's report."  *Id.* (emphasis added) (explaining "not a case in which the State attempted to bring in a testimonial lab report through a surrogate [witness]"); *see also Garret v. State*, 518 S.W. 3d 546, 554–55 (Tex. App.—Houston [1st Dist.] 2017) (testifying analyst performed analysis and comparison of criminal defendant's DNA profile and DNA profile obtained from scene; all testing and analysis took place at HFSC laboratory; testifying analyst testified about work completed by other analysts in laboratory where he also worked but also that he performed actual analysis and interpretation leading to his laboratory report confirming results).

Not so here.  In our case, Halsell had no personal knowledge about ReliaGene's analysts or their processes and procedures, although he was allowed to testify as if he did.  And, contrary to the testifying witness in *Paredes*, it is undisputed that Halsell did not just rely on raw computer-generated data from ReliaGene in

---

[3]     Instead, the forensic DNA testing would have "yield[ed] no result at all[,] rather than an improper result."  *Paredes v. State*, 462 S.W.3d 510, 518 (Tex. Crim. App. 2015).

order to reach his conclusion which linked appellant to the complainant's 2003 aggravated sexual assault in this case. Instead, he testified unequivocally that he relied on "[n]ot only . . . [ReliaGene's "Forensic Test Results"] report, but . . . also . . . the data that was generated by [ReliaGene's] laboratory." Halsell explained that he took ReliaGene's "case file," "worksheets," and "computer data" to perform his analysis. And the unknown analyst at ReliaGene "extracted, quantified, amplified, did all these steps in the process in order to create a DNA profile" that Halsell then "used as part of [his] analysis." Halsell's conclusions are dependent on more than just ReliaGene's "computer-generated data." His conclusions are dependent on a non-testifying analyst's report and testimonial statements.

The majority opinion seizes on the language in *Paredes*,[4] that "computer[-]generated DNA data is not testimonial" and "is not subject to the Confrontation Clause's cross-examination requirement" to justify its holding. *See Paredes*, 462 S.W.3d at 518–19. In doing so, the majority opinion ignores a significant portion of the Court of Criminal Appeals' reasoning in *Paredes*, namely that the testifying witness "did not introduce or testify regarding a formal report or

---

[4]    The same language is found in our previous opinion in *Garrett v. State*, 518 S.W.3d 546, 555 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) ("The raw DNA profiles 'are not the functional equivalent of live, in-court testimony because they did not come from a witness capable of being cross-examined. They com from a computer.'" (quoting *Paredes*, 462 S.W.3d at 518)).

18

assertion from a non-testifying analyst." *Id.* at 519. Accordingly, the majority opinion is incorrect in stating that the DNA evidence at issue in this instant case is merely "computer-generated data on which Halsell relied for his opinion" and, thus, not testimonial and does not violate appellant's right to confrontation. This conclusion is completely contrary to Halsell's own testimony that, in reaching his opinion, he relied on the analysis and "Forensic Test Results" report issued by ReliaGene and about which he had no knowledge.

Scarier yet, Halsell's testimony in this case lacks any assurances of reliability that existed in *Paredes*. For instance, we do not know how that "raw computer-generated data" the majority opinion finds so compelling was obtained because there was no one available for appellant to cross-examine or confront.[5] And when the State introduced the substance of ReliaGene's "Forensic Test Results" report into evidence through Halsell's testimony, the analyst who actually tested the

---

[5]     This problem is apparent due to the jury's confusion surrounding Halsell's testimony. During deliberations, the jury requested "the documentation of the evidence of the DNA." The jurors's disagreement over the "DNA numbers" led them to request "the testimony of the DNA expert on the analysis of the DNA."

19

DNA evidence and generated that report became a witness, just like Halsell.[6]

Accordingly, appellant had the right to confront that ReliaGene analyst, too.[7]

To be sure, the record in this case—Halsell's own testimony—contradicts the

majority opinion's skewed depiction of this case. Here, we are faced with the same

---

[6] There is no basis for admitting Halsell's testimony concerning ReliaGene's "Forensic Test Results" report and analysis on a basis other than for the truth of the matter asserted. As summarized in Justice Kagan's dissent in *Williams v. Illinois*:

> The plurality's primary argument to the contrary tries to exploit a limit to the Confrontation Clause recognized in Crawford. "The Clause," we cautioned there, "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." The Illinois Supreme Court relied on that statement in concluding that [the surrogate witness's] testimony was permissible. On that Court's view, "[the surrogate witness] disclosed the underlying facts from [the outside laboratory's] report" not for their truth, but "for the limited purpose of explaining the basis for her [expert] opinion," so that the factfinder could assess that opinion's value. The plurality wraps itself in that holding, similarly asserting that [the surrogate witness's] recitation of [the outside laboratory's] findings, when viewed through the prism of state evidence law, was not introduced to establish "the truth of any . . . matter concerning [the outside laboratory's]" report. But five Justices agree, in two opinions reciting the same reasons, that this argument has no merit: [the surrogate witness's] statements about [the outside laboratory's] report went to its truth, and the State could not rely on her status as an expert to circumvent the Confrontation Clause's requirements.

567 U.S. at 125–26 (Kagan, J., dissenting) (internal citations omitted).

[7] As if that weren't enough, at the time the DNA evidence was outsourced to ReliaGene in 2003, the former HPD Crime Lab had been shut down for failure to meet quality standards. Halsell testified about the doubt surrounding the quality of work being generated at the HPD Crime Lab and the questions about the integrity of storage of evidence there. Why, under these circumstances, would the State, in a cold case based solely on DNA evidence, be allowed to use a "surrogate witness" for the most critical evidence linking appellant to the sexual assault of the complainant? *Cold Case*, BLACK'S LAW DICTIONARY (11th ed. 2019).

20

circumstances as in *Bullcoming* and *Burch.* Halsell is not "more than a surrogate," he is *actually a surrogate* for a non-testifying analyst's testimonial statements and forensic report and the majority errs in holding otherwise. *See Bullcoming*, 564 U.S. at 661–65 ("[T]his violated the Confrontation Clause because the testing analyst's laboratory report was testimonial and it could not be admitted into evidence through the 'surrogate testimony' of another analyst." (internal citations omitted)); *Burch*, 401 S.W.3d at 640 ("Although the State did call the reviewing analyst at trial, that witness did not have personal knowledge of the testimonial facts being submitted. Consequently, she was not an appropriate surrogate witness for cross-examination."). Further, the fact that the trial court excluded ReliaGene's "Forensic Test Results" report is immaterial because Halsell made it clear that his testimony and his own report and conclusions were reliant upon ReliaGene's independently generated work product—not merely raw computer-generated data. Halsell did not limit his testimony to confirming that the two DNA profiles matched each other. Rather, Halsell testified that ReliaGene took certain steps and used certain processes to generate a DNA profile from the DNA evidence provided to it. He certified that the analysis performed by an unknown ReliaGene analyst was accurate despite his admitted lack of personal knowledge of ReliaGene's procedures and processes.

21

"Scientific testing is 'technical,' to be sure . . . , but it is only as reliable as the people who perform it." *Williams*, 567 U.S. at 137 (Kagan, J., dissenting). "That is why a defendant may wish to ask the analyst a variety of questions: How much experience do you have? Have you ever made mistakes in the past? Did you test the right sample? Use the right Procedures? Contaminate the sample in any way?" *Id.* (Kagan, J., dissenting).

As the Supreme Court has frequently said, the criminal defendant's right to confrontation "[i]s a fundamental right essential to a fair trial." *Pointer v. Texas*, 380 U.S. 400, 404 (1965). And courts must be willing to act zealously to protect the right from erosion. *Greene v. McElroy*, 360 U.S. 474, 496–97 (1959); *see also Barber v. Page*, 390 U.S. 719, 725 (1968) ("The right of confrontation may not be dispensed with so lightly."). When the right to confrontation is denied or significantly diminished, "the ultimate integrity of the fact-finding process" is called into question. *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (internal quotations omitted); *see also Pointer*, 380 U.S. at 404 (right of confrontation necessary to "expos[e] falsehoods and bring[] out the truth in the trial of a criminal case").

For these reasons, I would hold that the trial court erred in admitting the testimony of Halsell regarding the DNA evidence in this case because, by doing so, the trial court violated appellant's right to confrontation. I would further hold that

the erroneous admission of Halsell's testimony harmed appellant.  *See* TEX. R. APP. P. 44.2(a).  And I would sustain appellant's first issue.

## Sufficiency of the Evidence

In his second issue, appellant argues that the evidence was legally insufficient to support his conviction because there is "a complete lack of evidence, other than the improperly admitted testimony of . . . Halsell . . . to connect [a]ppellant to the . . . [aggravated] sexual assault of [the complainant]."

We review the legal sufficiency of the evidence by considering all the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt.  *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988).  We give deference to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts.  *Williams*, 235 S.W.3d at 750.  However, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused.  *Id.*

A person commits the offense of aggravated sexual assault if he intentionally or knowingly causes the sexual organ of another person, without that person's consent, to contact the sexual organ of another person, including him, and he uses or exhibits a deadly weapon in the course of the same criminal episode. TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(iii), (a)(2)(A)(iv). In this case, the only evidence presented at trial linking appellant to the aggravated sexual assault of the complainant was the erroneously admitted testimony of Halsell at trial. Without the DNA evidence from Halsell indicating that appellant could not be excluded as a DNA contributor in this case, the jury would only have heard the testimony of the complainant and two other witnesses—none of whom were able to identify appellant as the perpetrator of the aggravated sexual assault. *Cf. Jensen v. State*, 66 S.W.3d 528, 534 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (holding complainant's testimony defendant was person who sexually assaulted her sufficient to support conviction).

Thus, viewing the evidence in the light most favorable to the jury verdict, a rational juror could not conclude, beyond a reasonable doubt, that appellant committed the offense of aggravated sexual assault. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(iii), (a)(2)(A)(iv); *Jackson*, 443 U.S. at 318–19; *Williams*, 235 S.W.3d at 750. And I would hold that there is legally insufficient evidence to support appellant's conviction and sustain appellant's second issue.

Accordingly, I would reverse the judgment of the trial court and render a judgment of acquittal. *See Verduzco v. State*, 24 S.W.3d 384, 386 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Because the majority opinion does not, I respectfully dissent.


Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.

Countiss, J., dissenting.

Publish. TEX. R. APP. P. 47.2(b).

25